**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| KAPITUS SERVICING, INC., formerly known as COLONIAL FUNDING NETWORK, INC., AS AUTHORIZED SUB-SERVICING AGENT FOR STRATEGIC FUNDING SOURCE, INC., d/b/a KAPITUS, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 4:23-CV-00160-SPM |
| v. | ) ) | |
| DANIEL R. TRACHSEL and RYAN M. WUEBBELING, | ) ) ) | |
| Defendants. | ) ) | |

**<u>MEMORANDUM OPINION</u>**

This matter is before the Court on cross-motions for summary judgment filed by Defendants Daniel R. Trachsel and Ryan M. Wuebbeling ("Defendants") (ECF No. 93) and Plaintiff Kapitus Servicing, Inc., formerly known as Colonial Funding Network, as Authorized Sub-Servicing Agent for Strategic Funding Source, Inc., d/b/a Kapitus ("Kapitus" or "Plaintiff") (ECF No. 96). The motions have been fully briefed. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C.§ 636(c)(1). (ECF No. 23). For the following reasons, the Court will deny both motions.

**I.    PROCEDURAL BACKGROUND**

Kapitus is a lender that offers financing products to companies. In October 2018, Kapitus loaned money to Aphrodite Granite & Marble, Inc. ("Aphrodite"), a company founded by Antonios Xenos. The loan agreement specified that the proceeds were to be used solely for certain defined business purposes. Aphrodite defaulted on the loan shortly after it was made, and Aphrodite ceased operations in November

1

2018. Kapitus now asserts that two Aphrodite officers and directors—Defendants Trachsel and Wuebbeling—conspired with Xenos to procure loan proceeds on behalf of Aphrodite and then pay the loan proceeds to themselves, leaving Aphrodite with no money to continue operating or pay its debts. Defendants, on the other hand, argue that they were not officers or directors of Aphrodite but were simply, like Kapitus, creditors who loaned money to Aphrodite and received partial payment on their loans.

Litigation related to Kapitus's loan to Aphrodite began in December of 2018, when Kapitus filed suit against Aphrodite and Xenos (who was a guarantor of the loan to Aphrodite) in state court in Virginia. The Virginia Court determined that Aphrodite had fraudulently induced Kapitus into entering the Loan Agreement, and it entered a judgment against Aphrodite in the amount of $190,642.00, plus interest. Kapitus has not recovered any funds pursuant to that judgment. Kapitus's claims against Xenos were dismissed after Xenos filed a bankruptcy petition in the United States Bankruptcy Court for the Eastern District of Missouri.  In connection with Xenos's bankruptcy case, Kapitus filed an Adversary Proceeding, asserting that Xenos's debt to Kapitus was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) because Xenos had made misrepresentations to Kapitus on which Kapitus relied in making the loan. The Bankruptcy Court entered judgment in favor of Xenos, finding Kapitus had not proven that Xenos made representations with knowledge of their falsity or that Xenos made the representations deliberately with intent to deceive. ECF No. 94-5, at 104. Defendants were not parties in either the Virginia action or the Adversary Proceeding.

In the instant action, Kapitus asserts four claims against Defendants Trachsel and Wuebbeling based on their conduct while they were (according to Kapitus) directors and officers of Aphrodite: tortious interference with contract (Count I), conversion (Count II), unjust enrichment (Count III), and civil conspiracy (Count IV). Defendants move for summary judgment all four claims, arguing that (1) Plaintiff's claims are barred by the res judicata effect of the Bankruptcy Court's judgment in the Adversary

Proceeding, and (2) the undisputed evidence shows that Plaintiff cannot establish all of the elements of any of its claims. Plaintiff also moves for summary judgment on Counts I, III, and IV, arguing that the undisputed facts show Plaintiff is entitled to judgment as a matter of law on those claims and that Defendants cannot establish their affirmative defense of res judicata.

## II.    FACTUAL BACKGROUND[1]

The Court begins with a discussion of the facts about which there is no genuine dispute. Aphrodite was a granite and marble fabricating company founded by Antonios Xenos. Prior to September 2018, Xenos was the sole shareholder of Aphrodite. On September 6, 2018, DTG Investors, LLC (a single-member LLC owned by Defendant Trachsel) and WTG LLC (a single-member LLC owned by Defendant Wuebbeling), purchased 50% of the shares of Aphrodite for $350,000, pursuant to a Stock Purchase Agreement. Each defendant received a certificate representing 25% of the shares of stock in Aphrodite. Deposition of Daniel R. Trachsel Dep., Defs. Ex. C, ECF No. 94-3 ("Trachsel Dep."), at 34:25-35:7; Deposition of Ryan M. Wuebbeling, Defs.' Ex. D, ECF No. 94-4 ("Wuebbeling Dep."), at 48:16-24;.[2] On the same date, a Shareholders Agreement was signed by Xenos, DTG, and WTG. Also on the same date, a Resolution was signed by each director, identified as Xenos, Defendant Trachsel, and Defendant Wuebbeling. The Resolution approved the election of Defendants and Xenos to Aphrodite's board of directors. It also named the following officers: Xenos as President, Defendant Trachsel as Vice President, and Defendant Wuebbeling as Secretary. It gave powers to each officer concerning bank accounts, general financing, and contracting authority.

---

[1] Except as otherwise specified, the facts are taken from the parties' respective statements of undisputed material facts and responses.

[2] Defendants assert that "the Stock Certificates were drafted but never issued," ECF No. 119, ¶ 31, but they cite no evidence in support of that assertion.

On or around September 21, 2018, a promissory note was signed in which Aphrodite promised to pay Defendants $85,000, plus interest ("Promissory Note #1").[3] Promissory Note #1 provided for payments in in monthly installments of $7,671.96, beginning on October 21, 2018.

On October 4, 2018, Xenos and Defendants, as directors, signed a resolution permitting Xenos to sign for a line of credit not to exceed $150,000, plus fees. Also on October 4, 2018, the same parties signed an Indemnification Agreement in which Aphrodite and Xenos agreed to hold Defendants harmless from any liability related to Aphrodite.

On October 9, 2018, Xenos submitted (on behalf of Aphrodite) an application for financing to Bankcard Financial Group ("Bankcard"), an independent sales organization that assisted persons with obtaining commercial funding from Kapitus and other institutions.

On October 15, 2018, after the loan application had been submitted and discussions of terms had begun, Xenos, individually and on behalf of Aphrodite, signed a Promissory Note in favor of Defendants for the sum of $350,000 ("Promissory Note #2). Defs' Ex. H, ECF No. 94-8. The text of Promissory Note #2 indicates that it was "Executed this 6th day of September, 2018." The sum at issue in Promissory Note #2 represented the $350,000 investment previously made pursuant to the Stock Purchase Agreement. Promissory Note #2 required payments in three monthly installments of $125,000, to be made October 15, November 15, and December 15, 2018.

On October 19, 2018, Aphrodite as borrower, and Xenos as guarantor, executed a Loan Agreement, Use of Proceeds Certification, and Security Agreement and Guaranty (collectively, the "Loan Agreement"), in favor of Kapitus. Under the Loan Agreement, Kapitus agreed to loan Aphrodite $146,700,

---

[3] Defendants assert that they made the loan memorialized in Promissory Note #1 on September 6, 2018. *See* ECF No. 94, ¶ 3. However, the document's text indicates that it is dated September 21, 2018, and the Docusign email to which it is attached indicates that all parties had signed it by September 24, 2018. *See* Defs.' Ex. G, ECF No. 94-7.

with Aphrodite to pay interest in the amount of $44,010.00, for a total repayment amount of $190,710.00. The loan was to be paid in 205 payments of $931.00 (one each business day) over ten months. The Loan Agreement required that the proceeds be used exclusively for a "Business Purpose," which "refers solely to the purchase and acquisition of specific products or services used for the following purposes only: working capital, business insurance (but not self-insurance programs), franchise fees, employee training, the purchase of equipment, inventory, business supplies and raw materials, the construction, renovation or improvement of facilities (but not the purchase of real estate.)" ECF No. 94-10, at 13. The Loan Agreement also required Kapitus to use a Designated Account (ending in #2766) from which payment would be remitted to Kapitus via ACH.

On October 22, Kapitus transferred $146,700 in loan proceeds to the Designated Account, less fees, and filed a UCC Financing Statement to perfect its security interest pursuant to the Agreement. The net Kapitus funds of $143,012.50 cleared the Designated Account on October 23, 2018. On October 22, 2018, $181,379.68 was transferred from the Designated Account to a different account ending in #4697, which Kapitus did not have ACH authority to debit. On October 24, 2018, another $100,787.82 was transferred from the Designated Account to Account #4697.

Defendants requested payment from Aphrodite. On October 23, 2018, a cashier's check for $85,000 was purchased with funds from Account #4697 and made payable to Defendants. On October 26, 2018, a cashier's check in the amount of $90,000 was purchased with funds from Account #4697 and made payable to Defendants. Account #4697 became overdrawn soon after the purchase of the cashier's checks, and the account was closed. Aphrodite made only three payments on the loan, on October 26, October 29, and October 30, 2018. In November 2018, Aphrodite ceased operations.

Several additional facts related to this series of events are hotly disputed by the parties. First, the parties dispute whether (and when) the September 6th Stock Purchase Agreement was rescinded and

Defendants' investment in Aphrodite was converted into a loan. Defendants and Xenos all testified that at some point, they rescinded the Stock Purchase Agreement, though Xenos expressed confusion over how that occurred, when that occurred, and what that meant. Trachsel Dep., at 66:5-68:21; Wuebbeling Dep., at 59:5-25; 70:4-72:16; Deposition of Antonios T. Xenos, Defs.' Ex. F, ECF No. 94-6 ("Xenos Dep."), at 104:24-106:6; 107:16-20; 109:1-25; 110:20-112:21; 116:4-22. Defendants testified that they put together Promissory Note #2 (dated September 6, 2018, and signed October 15, 2018) to convert their stock shares into a loan, effectuating that rescission. Wuebbeling Dep. 71:1-6; Trachsel Dep. 66:7-11. However, Promissory Note #2 does not mention the Stock Purchase Agreement, and the parties to Promissory Note #2 (Defendants, Xenos, and Aphrodite) are not the same as the parties to the Stock Purchase Agreement (WTG LLC, DTG Investors, LLC, Xenos, and Aphrodite). The parties do not direct the Court to any other documentary evidence indicating that the Stock Purchase Agreement was rescinded. Additionally, as Plaintiff points out, Defendants did not return their stock certificates upon the execution of the Promissory Note and have continued to possess them. Wuebbeling Dep., at 48:21-49:2; Trachsel Dep., at 35:3-9

Second, the parties dispute when, if ever, Defendants ceased to be officers and directors of Aphrodite. As with the Stock Purchase Agreement, there is no documentary evidence indicating that the Shareholders Agreement or Resolution naming Defendants as officers and directors was rescinded. Xenos testified that Defendants remained on the board of directors through November 2018, when the company ceased operations. Xenos Dep. 20:21-22:8. He testified that Defendants "had the ability to steer all directions of the company all the way up until the end," that they "held meetings all the way up until the end," and that "[e]veryone was very much involved." *Id.* at 37:7-15; 38:14-15. He testified that even after the unwinding of the Stock Purchase Agreement, Defendants continued to have full access to Aphrodite's financial statements and exercised that access daily. Xenos Dep. 128:4-18. He testified that all checks had to be approved by Defendants before he could sign them, up until there was no money left in the company.

Xenos Dep. 128:22-129:8. There is evidence that even after October 15, 2018, Defendants were attempting to negotiate the sale of Aphrodite and/or its assets to various businesses, including Show Me Granite and Graniterra. Pl.'s Ex. 15-3, ECF No. 103-2, at 315-18; Wuebbeling Dep. 108:11-112:21. On October 25, 2018, Wuebbeling sent an email (copying Trachsel and Xenos) indicating that they appreciated Graniterra's interest but that they were "taking a different approach."

Third, the parties dispute whether Promissory Note #1 reflects a loan or a capital investment. Plaintiff asserts that it is uncertain whether Promissory Note #1 reflects a loan or capital investment, citing Defendant Trachsel's testimony that he "invested" more money a couple of weeks after the September 6th, 2018, investment, Trachsel Dep., at 67:4-7, and testimony from Xenos indicating that Defendants injected more capital into the company after the initial $350,000 but prior to October, Xenos Dep., at 63:13-19. Defendants rely on the text of the document, which described Defendants as the "Lender" and Aphrodite as the "Borrower" and which required Aphrodite to repay the $85,000, with interest, on a defined payment plan. ECF No. 94-7.

Fourth, the parties dispute how much Defendants knew about the Kapitus Loan Agreement. Defendants contend that they had no knowledge of the Kapitus Loan Agreement or its terms, citing testimony that they did not see the Loan Agreement prior to this lawsuit and that they did not know the name "Strategic Funding," under which Kapitus made the loan. Trachsel Dep., at 70:3-71:4; Wuebbeling Dep. 173:1-12. Plaintiff, on the other hand, points to evidence that Defendants knew or should have known about the Loan Agreement and its terms. Defendants authorized Xenos to seek a line of credit of up to $150,000 a few days before Xenos applied for the loan. Xenos testified that Defendants were in agreement with his applying for financing in mid-October and were aware of the Kapitus financing when he applied for it. Xenos Dep. 30:22-25, 76:25-77:4; 133:16-20. Additionally, Defendants were included on several emails related to this financing, though the emails did not mention a specific lender by name. For example,

on October 11, 2018, Xenos forwarded to Defendants an email from a Bankcard representative including various repayment options for a $150,000 or $200,000 loan, and Xenos asked, "Which option? Guys?" Pl.'s Ex. 1-2, ECF No. 103-1, at 213. Xenos testified that Defendants responded to him verbally and that he would not have chosen an option without a response from Defendants. Xenos Dep., at 45:16-48:2. Xenos also testified that Defendants were aware that Aphrodite had received the financing from Kapitus and were aware of the deposits being made into the Aphrodite bank accounts. Xenos Dep. 77:5-13; 92:16-93:1, 133:21-23.

Finally, the parties dispute whether the money Defendants received from Aphrodite can be sourced or traced to the proceeds of the Kapitus loan. Defendants point out that the day before the Kapitus loan cleared Aphrodite's account, a separate lender wired $177,355.00 to the account. They argue that there is no evidence to show whether the cashier's checks came from that loan, the Kapitus loan, or general Aphrodite revenue. Plaintiff, on the other hand, argues that if Aphrodite's bank statements are analyzed under equitable tracing principles, at least some of the funds used to purchase the cashier's checks can be traced to the Kapitus loan proceeds.

## III.    LEGAL STANDARD

The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *Accord, e.g., Smith v. Lisenbe*, 73 F.4th 596, 600 (8th Cir. 2023). The movant "bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact." *Henderson v. State Farm Fire & Cas. Co.*, 113 F.4th 1042, 1049-50 (8th Cir. 2024) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012)). If the movant does so, "[t]he nonmovant must then 'respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for

trial.'" *Id. (*quoting *Gannon Int'l, Ltd.*, 684 F.3d at 792). A dispute about a material fact is genuine, making summary judgment inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "In ruling on a summary judgment motion, a court must view the facts in the light most favorable to the non-moving party." *Leonetti's Frozen Foods, Inc. v. Rew Mktg., Inc.*, 887 F.3d 438, 442 (8th Cir. 2018). "In reaching its decision, a court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Id.* (internal quotation marks omitted).

"The filing of cross motions for summary judgment does not necessarily indicate that there is no dispute as to a material fact, or have the effect of submitting the cause to a plenary determination on the merits." *Milburn v. Zurich Am. Ins. Co*., 478 F. Supp. 3d 789, 791 (E.D. Mo. 2020) (quoting *Wermager v. Cormoran Tp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983)). Each motion "must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." *Jaudes v. Progressive Preferred Ins. Co.*, 11 F. Supp.3d 943, 947 (E.D. Mo. 2014).

## IV.  DISCUSSION

### A.  Res Judicata

The Court begins with Defendants' argument that they are entitled to summary judgment on all of Kapitus's claims based on the res judicata effect of the judgment of the United States Bankruptcy Court in the Adversary Proceeding. Defendants argue that Kapitus's claims in this case arise out of the same nucleus of operative facts as Kapitus's claims in the Adversary Proceeding and could have been litigated in that case, so Kapitus is precluded from asserting them in this case.

Because the prior court judgment at issue in this case was entered by a federal bankruptcy court, applying federal bankruptcy law, the Court finds that federal law applies to the res judicata issue. *See*

*Covert v. LVNV Funding, LLC*, 779 F.3d 242, 245 (4th Cir. 2015) ("Federal law governs the res judicata effect of earlier bankruptcy proceedings."); *Hursh v. DST Sys., Inc.*, 666 F. Supp. 3d 947, 983 n. 34 (W.D. Mo. 2023) ("When a federal court sitting in diversity determines the *res judicata*—or collateral estoppel— effect of a prior judgment entered in a federal case premised on federal question jurisdiction, federal law governs."); § 4470.3 Res Judicata Between State and Federal Courts—Exclusive Federal Jurisdiction— Bankruptcy, 18B Fed. Prac. & Proc. Juris. § 4470.3 (3d ed.) (3d ed.) ("Reaching out beyond bankruptcy proceedings, a bankruptcy judgment also can establish claim preclusion or issue preclusion in a subsequent civil proceeding. Here too, federal law should control the preclusion question.") (footnotes omitted).

Res judicata is an affirmative defense on which Defendants bear the burden of proof. *Hintz v. JPMorgan Chase Bank, N.A.*, 686 F.3d 505, 509 (8th Cir. 2012) (citing *Howard v. Green*, 555 F.2d 178, 181 (8th Cir. 1977)). Thus, to prevail on its motion based on res judicata, Defendants "must adduce evidence to support each element of [res judicata] and demonstrate the lack of any genuine issue of material fact with regard to" res judicata. *Eaton v. Marion Cnty. Fair Ass'n*, 172 F. Supp. 2d 1184, 1187 (S.D. Iowa 2001) (internal quotation marks omitted). On the other hand, to prevail on its motion for summary judgment on this defense, Plaintiff must show that there is an absence of evidence to support an essential element of the defense. *See, e.g., Liberty Mut. Fire Ins. Co. v. Centimark Corp.*, No. 4:08CV230DJS, 2009 WL 2177231, at *1 (E.D. Mo. July 22, 2009).

To establish that a claim is barred by res judicata, also known as claim preclusion, a party must show: "(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action." *Yankton Sioux Tribe v. U.S. Dep't of Health & Hum. Servs.*, 533 F.3d 634, 639 (8th Cir. 2008) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)). "With respect to the 'same claims or causes of action' element of claim preclusion . . .

10

[the Eighth Circuit has] held that 'whether a second lawsuit is precluded turns on whether its claims arise out of the same nucleus of operative facts as the prior claim." *Magee v. Hamline Univ.*, 775 F.3d 1057, 1059 (8th Cir. 2015) (quoting *Costner*, 153 F.3d at 673). Res judicata "applies to claims previously litigated as well as those which *might* have been litigated in the previous action." *Popp Telcom v. Am. Sharecom, Inc.*, 210 F.3d 928, 940 (8th Cir. 2000).

Defendants make no attempt to address the third element: that both suits involve the same parties, or those in privity with them. As Plaintiff points out, the suits did not involve the same parties, because neither Trachsel nor Wuebbeling was a party to the prior proceeding. Defendants do not argue that they were in privity with Xenos. Thus, Defendants have not demonstrated that they are entitled to judgment as a matter of law on the basis of res judicata.

Conversely, Plaintiff has not demonstrated that it is entitled to judgment as a matter of law on the question of res judicata because it has not demonstrated that there is no genuine issue of material fact as to any one of the elements of this defense. Plaintiff does not challenge the first or second elements. As to the third element, Plaintiff points out that Defendants were not parties to the prior action but does not argue Defendants were not in privity with Xenos. As to the fourth element, although Plaintiff points to some differences between the two sets of claims, Plaintiff does not argue that the two sets of claims do not arise out of the same nucleus of operative facts, nor is it obvious to the Court that they do not.

The Court finds that neither Plaintiff nor Defendants have demonstrated that there is an absence of genuine issues of material fact and that they are entitlement to judgment as a matter of law on the question of res judicata.

## B.  Count I: Tortious Interference with Contract

In Count I, Plaintiff alleges that Defendants tortiously interfered with Kapitus's Loan Agreement with Aphrodite and Xenos by directing Xenos to take the funds Kapitus provided to Aphrodite for its

11

business and pay those funds to Defendants. Under Missouri law, "Tortious interference with a contract or business expectancy requires proof of: (1) a contract or valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) a breach induced or caused by defendant's intentional interference; (4) absence of justification; and (5) damages." *Bishop & Assocs., LLC v. Ameren Corp.*, 520 S.W.3d 463, 472 (Mo. 2017) (quoting *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. 1996)). Defendants argue that they are entitled to summary judgment because there is no evidence of either element 2 (knowledge) or element 4 (absence of justification). Plaintiff argues that that it is entitled to summary judgment because the undisputed evidence establishes every element of the claim. The Court begins with Defendants' arguments.

### 1. Knowledge

For purposes of a tortious interference claim, a plaintiff "must show either that the interfering party had actual knowledge of the existence of the contract and of plaintiff's interest in it, or that the interfering party had knowledge of such facts and circumstances that would lead a reasonable person to believe in the existence of the contract and plaintiff's interest in it." *Howard v. Youngman*, 81 S.W.3d 101, 113 (Mo. Ct. App. 2002) (internal quotation marks omitted). Knowledge of the details of the contract is not necessary; "[i]t is enough to show that defendant had knowledge of facts, which, if followed by reasonable inquiry, would have led to a complete disclosure of the contractual relations and rights of the parties." *Id.* (internal quotation marks omitted).

Defendants are not entitled to summary judgment based on the knowledge element. Viewing the facts in the light most favorable to Plaintiff, there is sufficient evidence from which a jury could find that Defendants had knowledge of facts and circumstances that would lead a reasonable person to believe in the existence of the Kapitus Loan Agreement and Kapitus's interest in it, and that a reasonable inquiry would have led to a complete disclosure of the contractual relations and rights of the parties. As discussed

above, there is evidence that Defendants signed a resolution authorizing Xenos to apply for a $150,000 line of credit a few days before he applied for financing; that Defendants were included on numerous emails in which options for the financing were discussed; that Xenos asked Defendants which option to choose and they responded; and that Defendants were aware that the deposits were made into Aphrodite's account. Even if Defendants did not have actual knowledge of the name of the lender or all of the specific terms of the Loan Agreement, such knowledge is not required for purposes of a tortious interference claim. *See Robb v. Bond Purchase, L.L.C.,* 580 S.W.3d 70, 85 (Mo. Ct. App. 2019) (rejecting the defendant's argument that the knowledge element was not satisfied because the evidence showed only that the plaintiff had thought about selling its shares of stock and the defendant did know any "detail regarding the identity of the buyer, the sale price or the expected closing date"; noting that knowledge of those details was not necessary and that the evidence included several email communications including the defendant and discussing the terms of the possible sale). *See also Pinebrook Holdings, LLC v. Narup*, No. 4:19-CV-1562-MTS, 2022 WL 1773057, at *9 (E.D. Mo. June 1, 2022) ("Knowledge of the precise terms of the contract is usually not necessary, and Defendants point to no Missouri case that requires such. In fact, courts applying Missouri law have expressly rejected such strict interpretation.") (citing *RightCHOICE Managed Care, Inc. v. Hosp. Partners, Inc.*, 5:18-cv-06037-DGK, 2021 WL 4258747, at *5 (W.D. Mo. Sept. 17, 2021)).

### 2. *Absence of Justification*

The Court next turns to the absence of justification element. "Absence of justification refers to the absence of a legal right to justify actions taken." *Western Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 20 (Mo. 2012) (internal quotation marks omitted). "A defendant cannot be held liable for interfering with a business relationship if he or she has an unqualified right to perform the act." *Id.* "If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then the plaintiff

must show that the defendant employed improper means in seeking to further only his or her own interests." *Id.* "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or the common law." *Id.* (quoting *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. 2006)). Missouri courts require a showing of "improper means" for purposes of both tortious interference with business expectancy and tortious interference with an existing contract. *See Clinch v. Heartland Health*, 187 S.W.3d 10, 16-17 (Mo. Ct. App. 2006).

Defendants' position is that they were justified in requesting and accepting the $175,000 in payments because they (like Kapitus) were creditors of Aphrodite, and they were requesting payment pursuant to valid promissory notes. *See Cent. Bank of Lake of the Ozarks v. Shackleford*, 896 S.W.2d 948, 956 (Mo. Ct. App. 1995) (holding a bank was justified in taking actions to foreclose on a property and sell it for a profit even though the bank's actions deprived the plaintiff of an expected commission on the sale of the property; noting that "[o]ne who has an existing economic interest in another's business affairs is privileged to interfere with a business expectancy to protect his own economic interest and is not liable for such interference if his action was one which he had a definite legal right to take without any qualification" and that "the entire principal of [all three notes] was due and unpaid, and interest on all three was delinquent"). To support this position, Defendants point to evidence that they rescinded the Stock Purchase Agreement and converted their stock purchase into Promissory Note #2 and to evidence that both Promissory Note #1 and Promissory Note #2 were both signed before Kapitus loaned money to Aphrodite.

Plaintiff's position is that Defendants' actions were not justified because Defendants were not arms' length creditors, but were instead officers and directors of Aphrodite who orchestrated a series of events under which Aphrodite would obtain loan money from Kapitus and then pay the proceeds to

Defendants to recoup Defendants' investment in the company. Plaintiff emphasizes that Promissory Note #2 was signed by Xenos only *after* Defendants authorized Xenos to seek financing. Plaintiff argues that Defendants' actions breached their fiduciary duties to Aphrodite, promoting Defendants' own self-interest but leaving Aphrodite moneyless and leading to its closure. *See, e.g.*, *Zakibe v. Ahrens & McCarron, Inc.*, 28 S.W.3d 373, 382-83 (Mo. Ct. App. 2000) ("It is well-established that corporate officers and directors occupy a fiduciary relation to the corporation and to the stockholders; [t]heir position is one of trust and they are bound to act with fidelity and subordinate their personal interest to the interest of the corporation should there be a conflict . . . . If a corporation suffers losses to its corporate assets as a result of a director's or officer's breach of fiduciary duty, it can bring an action in tort to recover those damages.") (internal quotation marks omitted); *Bishop*, 520 S.W.3d at 473 (noting, in a case involving a claim that employees tortiously interfered with a business expectancy between their employer and the plaintiff, that that "satisfying the absence of justification element requires a showing the defendant interfered with the business expectancy for personal, as opposed to corporate, interests"); *Sisson v. Patel*, No. 20-05101-CV-SW-BP, 2022 WL 1736836, at *3 (W.D. Mo. Apr. 13, 2022) ("[A] corporate officer may be liable for tortiously interfering with a contract of the corporation if he or she acted out of self interest also used improper means") (internal quotation marks and alterations omitted) (citing *Meyer v. Enoch*, 807 S.W.2d 156, 160 (Mo. Ct. App. 1991)); *Meyer*, 807 S.W.2d at 159 ("A corporate officer, acting within his or her authority, is privileged to induce a breach of a corporate contract provided that he or she uses no improper means, acts in good faith to protect the corporate interest and does not act out of self interest."). Plaintiff also points out that the $175,000 in payments made in late October do not appear to be consistent with the terms of the promissory notes.[4] *See Env't Energy Partners, Inc. v. Siemens Bldg. Techs., Inc.*, 178 S.W.3d

---

[4] Promissory Note #2 required a $125,000 payment on October 15, 2018, and Promissory Note #1 required monthly installment payments of $7,671.96, beginning on October 21st. Defendants were paid $175,000 in late October.

691, 704 (Mo. Ct. App. 2005) ("Contractual provisions can determine the presence, or lack of presence, of justification with respect to a claim of tortious interference with a business expectancy or contract.").

Defendants' sole challenge to Plaintiff's argument is that they were not officers or directors of Aphrodite and that Plaintiff is collaterally estopped from arguing that they were. Defendants did not assert collateral estoppel as an affirmative defense in its answer. Assuming, *arguendo*, that the collateral estoppel argument has not been waived,[5] the Court finds it is without merit. Defendants' collateral estoppel argument is based on (1) Plaintiff's stipulation in the Adversary Proceeding that at all times relevant, Xenos "was and is Aphrodite's sole owner, controlled Aphrodite, and made all decisions and statements to Plaintiff relevant to the issues herein," Defs.' Ex. A, ECF No. 94-1, at ¶ 30; and (2) the Bankruptcy Court's statement that "There's no doubt . . . that the plaintiff loaned money to [Xenos], who was a guarantor and at relevant times controlled the business of Aphrodite, which was his LLC," Def. Ex. E, ECF No. 94-5, at 97-98.  Collateral estoppel, also known as issue preclusion, "generally provides that when an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim." *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 912 F.3d 445, 452 (8th Cir. 2018) (internal quotation marks omitted). Under Eighth Circuit law, collateral estoppel has five elements:

> (1) the party sought to be precluded in the second suit was a party . . . in the prior suit; (2) the issue sought to be precluded is the same as the issue involved in the prior action; (3) the issue was actually litigated in the prior action; (4) the issue was determined by a valid and final judgment; and (5) the determination in the prior action was essential to the judgment.

---

[5] Plaintiff argues collateral estoppel is an affirmative defense that has been waived because it is not included in Defendants' answer. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008) ("Generally, failure to plead an affirmative defense results in a waiver of that defense.").

*Id.* (quoting *Morse v. Comm'r*, 419 F.3d 829, 834 (8th Cir. 2005)).[6] Defendants do not argue either that the issue of Xenos's exclusive ownership or control over Aphrodite was actually litigated in the Adversary Proceeding or that any determination about the exclusivity of Xenos's ownership or control was essential to the judgment entered by the Bankruptcy Court. In the Adversary Proceeding, Kapitus attempted to establish that Xenos's debt to Kapitus was nondischargeable pursuant to § 523(a)(2)(A) based on certain misrepresentations Xenos allegedly made to Kapitus, none of which concerned the exclusivity of his ownership or control over Aphrodite. *See* Pl.'s Reply, ECF No. 124, at 3-4 (citing Defs.' Ex. E, ECF No. 94-5). The Bankruptcy Court ultimately concluded that Kapitus had not established that Xenos made the representations with knowledge of their falsity or with intent to deceive. The Court finds no evidence that the exclusivity of Xenos's ownership or control over Aphrodite was actually litigated or was essential to the judgment of the bankruptcy court.[7] For these reasons, the Court finds that neither of these elements are met.

Defendants also argue that the undisputed facts show that they were not directors or officers of Aphrodite. The Court disagrees. As set forth in the fact section, there is evidence to the contrary, including Xenos's testimony that Defendants continued to be directors of Aphrodite, with the ability to steer all directions of the company, all the way up until it ceased operations in November 2018. There is also

---

[6] As discussed above with respect to res judicata, the Court finds federal law applies to the collateral estoppel issue. *See Hursh*, 666 F. Supp. 3d at 983 n. 34. However, the Court's decision would be the same even if it applied Missouri law. *See Brown v. Carnahan*, 370 S.W.3d 637, 658-59 (Mo. 2012) (Under Missouri law, collateral estoppel (or issue preclusion) "requires that the issue was fully and fairly litigated, *that the issue was essential to the earlier judgment*, and that the earlier judgment be final and binding on the party against whom it is asserted.") (emphasis added).

[7] Similarly, to the extent that Defendants argue that the Plaintiff is collaterally estopped from questioning the validity of either promissory note based on the bankruptcy court's statement that, "at about the time that the loan was made from plaintiff to defendant, Ryan Wobling (sic) was paid a debt that was owed to him," Defs. Ex. E, ECF No. 94-5, at 108, the Court finds no evidence that the question of the validity of any debt to either Defendant was actually litigated or was essential to the judgment of the bankruptcy court.

evidence of Defendants' continued involvement in Aphrodite's decisions and operations after October 15, 2018, evidence that Defendants never returned their stock certificates, and no documentary evidence demonstrating the rescission of the Stock Purchase Agreement or Shareholders Agreement.

Viewing the facts in the light most favorable to Plaintiff, Defendants were officers and directors of Aphrodite throughout the relevant time frame, with corresponding fiduciary duties. They authorized Xenos to seek financing, and after he applied for such financing, they executed a promissory note in an attempt to recoup their investment. They knew about Aphrodite's financial condition because they exercised their access to Aphrodite's bank statements daily, and they knew when the proceeds of the Kapitus loan were deposited into Aphrodite's accounts. As soon as Aphrodite received the Kapitus financing, Defendants requested payment and accepted $175,000 from Aphrodite, despite knowing that the payment would leave Aphrodite moneyless and with no capital to operate or service its debts. If a jury accepts this version of events, it could find that Defendants used improper means (including a breach of fiduciary duty) and acted in their own self-interest, and thus lacked justification for their actions. Defendants are not entitled to summary judgment based on the absence of justification element. [8]

In sum, the Court finds that Defendants have not established an absence of genuine issues of material fact as to either the knowledge element or the justification element, so they are not entitled to summary judgment on the tortious interference claim.

---

[8] The Court is aware of authority in Missouri to support the proposition that an agent or officer of a corporation cannot be liable for tortiously interfering in the corporation's contracts, even if the officer uses improper means or acts in his own self-interest, because the officer is not a third party to the contract. *See Halderman v. City of Sturgeon*, 670 S.W.3d 193, 206-08 (Mo. Ct. App. 2023). The question of whether the defendant is a third party to the contract is separate issue from absence of justification. *Id.* at 206. The parties have not raised in their briefing the issue of whether Defendants were third parties to the contract. Because the issue is not properly before the Court, the Court has not considered it in ruling on the parties' cross-motions for summary judgment.

The Court finds that Plaintiff is not entitled to summary judgment on its tortious interference claim because it has not demonstrated an absence of genuine issues of material fact related to the absence of justification element.[9] Viewing the evidence in the light most favorable to *Defendants* for purposes of Plaintiff's motion for summary judgment, Defendants and Xenos rescinded the Stock Purchase Agreement and Shareholders Agreement sometime in early to mid-October, were not directors or officers at any relevant time, and owed no fiduciary duties to Aphrodite. They were simply creditors who demanded payment on valid promissory notes and received partial payment. If a jury accepts this version of events, it could find that Defendants were justified in their actions, in which case Plaintiff could not establish every element of the claim.

In sum, the Court finds genuine issues of material fact that preclude summary judgment on the tortious interference claim in either Plaintiff's or Defendants' favor.

## C. Count II: Conversion

In Count II, Plaintiff alleges that the Loan Agreement gave Plaintiff an immediate security interest in all of Aphrodite's cash on hand and on deposit in banks, as well as all other assets, and that Defendants improperly took control of the Kapitus loan proceeds and monies in Aphrodite's bank accounts when they instructed Xenos to take the Funds from Plaintiff and pay the Funds over to Defendants. Defendants move for summary judgment on Count II. Plaintiff does not.

"Conversion is the unauthorized assumption of the right of ownership over personal property of another to the exclusion of the owner's rights." *Reyna Hotel Corp. v. Lotus Hosp. Mgmt., LLC*, No. WD 86858, 2025 WL 1226231, at *11 (Mo. Ct. App. Apr. 29, 2025) (quoting *Massood v. Fedynich*, 530 S.W.3d 49, 57 (Mo. Ct. App. 2017)). "Conversion requires proof of three elements: (1) the plaintiff owned

---

[9] Because the Court finds that Plaintiff has not shown an absence of genuine issues of material fact on the justification element, the Court need not address the knowledge element as it relates to Plaintiff's motion.

the property or was entitled to possess it; (2) the defendant took possession of the property with the intent to exercise some control over it; and (3) the defendant thereby deprived the plaintiff of the right to possession." *Id.* at *12 (Mo. Ct. App. Apr. 29, 2025) (quoting *Massood*, 530 S.W.3d at 57).

"As a general rule a claim for money may not be in conversion because conversion lies only for a specific chattel which has been wrongfully converted." *In re Est. of Boatright*, 88 S.W.3d 500, 506 (Mo. Ct. App. 2002) (quoting *Dayton Const., Inc. v. Meinhardt*, 882 S.W.2d 206, 208 (Mo. Ct. App. 1994)). "Nevertheless, money can be an appropriate subject of conversion 'when it can be described or identified as a specific chattel." *Id.* (quoting *Breece v. Jett*, 556 S.W.2d 696, 710 (Mo. Ct. App. 1977)). "Also, misappropriated funds placed in the custody of another for a definite purpose may be subject to a suit for conversion." *Id.* (quoting *Reason v. Payne*, 793 S.W.2d 471, 474 (Mo. Ct. App. 1990)). *See also Reyna*, 2025 WL 1226231, at *11 ("Although conversion does not ordinarily lie for a claim for money, there is an exception for funds placed in the custody of another for a specific purpose: the diversion of the funds 'for other than such specified purpose subjects the holder to liability in conversion'") (quoting *Dillard v. Payne*, 615 S.W.2d 53, 55 (Mo. 1981)); *Vogt v. State Farm Life Ins. Co.*, 963 F.3d 753, 774 (8th Cir. 2020) (rejecting the defendant's argument that a conversion claim failed because money cannot be the subject of a conversion claim; noting that "Missouri law recognizes an exception to the general rule that money cannot be converted" where funds placed in the custody of another are diverted for other than the specified purpose).

Defendants first argue that the loan proceeds and other collateral are not the proper subject of a conversion claim because they cannot be described as a "specific chattel" or as "funds placed in the custody of another for a definite purpose." The Court disagrees, at least as to the loan proceeds. As Kapitus argues, the loan proceeds were provided to Defendants pursuant to an agreement that required the proceeds to be used exclusively for a definite purpose: the "Business Purpose" specifically defined in the Use of

Proceeds Certificate, which "refers solely to the purchase and acquisition of specific products or services used for the following purposes only: working capital, business insurance (but not self-insurance programs), franchise fees, employee training, the purchase of equipment, inventory, business supplies and raw materials, the construction, renovation or improvement of facilities (but not the purchase of real estate)." ECF No. 98-4, at 13. Plaintiff has cited evidence that Defendants requested the loan proceeds be used for something other than the specified purpose: paying themselves. Defendants do not argue that making payment on a valid promissory note is a Business Purpose as defined by the Loan Agreement.

Addressing the second element of the conversion claim (that the defendant took possession of the property with the intent to exercise some control over it), Defendants argue that there is no evidence that any of the $175,000 they received on October 23rd and October 26th can be sourced to the $143,012.50 in loan proceeds from Kapitus that were deposited into Aphrodite's account on October 23rd. They note that on October 22nd, a different lending company wired $177,355.00 to Aphrodite. They argue that there is no evidence that the payments to Defendants can be sourced to the Kapitus funds, the funds from the other lending company, or Aphrodite's general revenue. In response, Plaintiff argues that the Court should use equitable tracing principles to trace the funds in Aphrodite's accounts and that when such principles are applied, $86,495.00 of the $90,000 cashier's check paid to Defendants on October 26th can be traced to the Kapitus proceeds.

In *General Electric Capital Corp. v. Union Planters Bank, N.A.*, the Eighth Circuit noted that where numerous sources deposit funds into an account, it is difficult for the plaintiff in a conversion claim to determine whether funds transferred out of that account can be traced to the funds deposited by the plaintiff. 409 F.3d 1049, 1055 (8th Cir. 2005). The court noted that equitable tracing principles can ease this difficulty in certain situations. *Id.* Relying on a comment in Missouri's Uniform Commercial Code, the court found that equitable tracing is appropriate "when the payee receives funds 'out of ordinary course

or otherwise in collusion with the debtor.'" *Id.* at 1056. The court noted that Missouri uses the lowest intermediate balance rule for equitable tracing purposes. *Id.* at 1059. "Under the lowest intermediate balance rule, it is assumed the traced proceeds are the last funds withdrawn from a contested account. Once the traced proceeds are withdrawn, however, they are treated as lost, even though subsequent deposits are made into the account." *Id.* at 1059-60 (quoting *Meyer v. Norwest Bank Iowa*, 112 F.3d 946, 951 (8th Cir. 1997)).

The Court finds genuine issues of material fact regarding whether equitable tracing principles are appropriate in this case and, if they are, how much of the payments made to Defendants can be traced to the Kapitus loan proceeds. As discussed above with respect to the tortious interference claim, there are genuine issues of material fact regarding whether the payments to Defendants were made outside of the ordinary course or in collusion with Xenos, such that equitable tracing principles would apply here. Defendants have not argued that under such equitable tracing principles, none of the payments made to Defendants can be traced to the Kapitus loan. The Court finds that Defendants have not met their burden of demonstrating that there are no genuine issues of material fact are entitled to judgment as a matter of law on this claim.

For all of the above reasons, Defendants' motion for summary judgment on Count II will be denied.

### D. Count III: Unjust Enrichment

Under Missouri law, "the essential elements of unjust enrichment are: "(1) the defendant was enriched by the receipt of a benefit; (2) that the enrichment was at the expense of the plaintiff; and (3) that it would be unjust to allow the defendant to retain the benefit." *Cent. Parking Sys. of Missouri, LLC v. Tucker Parking Holdings, LLC*, 519 S.W.3d 485, 498 (Mo. Ct. App. 2017) (quoting *Holliday Invs., Inc. v. Hawthorn Bank*, 476 S.W.3d 291, 295 (Mo. Ct. App. 2015)). "The third element is the most important and difficult to establish." *Hoffmeister v. Kranawetter*, 407 S.W.3d 59, 61 (Mo. Ct. App. 2013). "In

determining whether it would be unjust for the defendant to retain the benefit, courts consider whether any wrongful conduct by the defendant contributed to the plaintiff's disadvantage." *S & J, Inc. v. McLoud & Co.*, 108 S.W.3d 765, 768 (Mo. Ct. App. 2003)

Defendants first challenge the third element: that it would be unjust to allow them to retain the benefit at issue. Relying on *Howard v. Turnbull*, 316 S.W.3d 431, 438 (Mo. Ct. App. 2010), Defendants argue that it is not unjust to permit the defendant to retain a benefit where, in conferring the benefit, plaintiff voluntarily entered into a venture with known risks and the expectation of a profit. In *Howard*, the plaintiff pledged his property to secure a line of credit made available to an LLC. *Id.* at 433-34. In exchange, the plaintiff received from the LLC a promise of annual interest payments on the assets committed. *Id.* at 435. The LLC defaulted on its indebtedness to the bank, and the bank threatened foreclosure. *Id.* To avoid foreclosure of his property, the plaintiff paid the bank $150,000 in exchange for the release of the deed of trust. *Id.* He later filed an unjust enrichment claim against the owners of the LLC, asserting that the pledge of his property and the $150,000 payment unjustly enriched the owners of the LLC. *Id.* Following a bench trial, the trial court entered judgment in favor of the defendants. *Id.* The Missouri Court of Appeals affirmed the trial court's holding any enrichment that occurred was not unjust. *Id.* at 438-39. It stated:

> A venture voluntarily entered into, with known risks and with the expectation of a profit, cannot be compensated for via a claim for unjust enrichment. When a person enters into a potentially risky venture, it is simply not unjust for him to bear the adverse consequences of the risk, given that he surely would have accepted the beneficial consequences had they materialized. In other words, under such circumstances, the retention of a benefit by the defendants would not have been inequitable.

*Id.* at 438 (internal citations and quotation marks omitted). The court found that the plaintiff "assumed the risk inherent in his execution of [the deed of trust], with full knowledge that [the LLC] could default on its debt and in the expectation that he would receive the benefits [of the agreement]." *Id.* at 439. It noted that "[h]ad the venture gone as planned, [the plaintiff] would have received regular interest payments on

23

his property" and other things of value. *Id.* It concluded, "Just as it would not have been unjust for [the plaintiff] to have reaped these benefits, it is not unjust for him to bear the adverse consequences of the risk he voluntarily undertook." *Id.*

Although it is a somewhat close call, the Court finds *Howard* is distinguishable. Like the plaintiff in *Howard*, Kapitus voluntarily entered into a venture with hope of a profit and the knowledge that the debtor could default. However, *Howard* did not involve allegations of wrongful conduct on the part of the defendant that contributed to the plaintiff's disadvantage. As discussed at length above, Plaintiff has cited evidence to suggest that Defendants were officers and directors of Aphrodite who had superior knowledge of Aphrodite's financial condition, authorized Xenos to seek funding on behalf of Aphrodite, then immediately diverted the loan proceeds to themselves, in a manner inconsistent with the Loan Agreement and in breach of their fiduciary duties to Aphrodite. As Plaintiff argues, under this version of events, this was not simply a risky loan that did not pan out, but one that was predestined to fail because of Defendants' wrongful actions. If this evidence is credited, the Court finds that Plaintiff can establish that it would be unjust for Defendants to retain the funds.

Defendants also suggest that they were not enriched, unjustly or otherwise, because they held promissory notes totaling more than the amount they were paid. The Court finds that the merits of that argument depend on whether Defendants held valid promissory notes totaling more than $175,000, which is in dispute. Thus, the Court will deny Defendants' motion for summary judgment on this claim.

Plaintiff argues that it is entitled to summary judgment because it can establish all of the elements of the unjust enrichment claim. The Court disagrees. As discussed above, the question of whether Defendants engaged in the wrongful conduct that would distinguish this case from *Howard* is hotly contested. Under Defendants' version of events, it would not be unjust for Defendants to retain the funds at issue.

24

### E.  Count IV: Civil Conspiracy

To establish a civil conspiracy claim, a plaintiff must show: "(1) two or more persons; (2) with an unlawful objective; (3) after a meeting of the minds; (4) committed at least one act in furtherance of the conspiracy; and (5) [the plaintiff] was thereby damaged." *Western Blue Print Co.*, 367 S.W.3d at 22. Furthermore, "[i]n Missouri, if tortious acts alleged as elements of a civil conspiracy claim fail to state a cause of action, then the conspiracy claim fails as well." *Id.* (emphasis added) (quoting *Oak Bluff Partners, Inc. v. Meyer*, 3 S.W.3d 777, 781 (Mo. 1999)). *See also Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008) ("If the underlying wrongful act alleged as part of a civil conspiracy fails to state a cause of action, the civil conspiracy claim fails as well.").

Defendants' only argument in support of their motion for summary judgment on this claim is that Kapitus has failed to establish that Defendants engaged in any wrongful acts to support its underlying claims for tortious interference, conversion, or unjust enrichment. For the reasons discussed above, the Court finds genuine issues of material fact exist regarding whether those wrongful acts occurred. Thus, Defendants have not shown that they are entitled to summary judgment on this claim. Similarly, for the same reasons the Court has found genuine issues of material fact preclude summary judgment in Plaintiff's favor on the underlying claims, the Court finds Plaintiff is not entitled to summary judgment in its favor on the civil conspiracy claims.

### V.  CONCLUSION

For all of the above reasons,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment  (ECF No. 93) is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (ECF No. 96) is **DENIED**.

SHIRLEY P. MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of June, 2025.